## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

TRACY FRY, individually and on behalf of all
other similarly situated,

                    Plaintiff,

v.

MIDFLORIDA CREDIT UNION,

                    Defendant.

Case No. 8:15-CV-2743 RAL TGW

Judge Assigned:  Hon. Richard A. Lazzara

**PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT, APPROVAL OF ATTORNEYS' FEES AND COSTS, AND
APPROVAL OF THE CLASS REPRESENTATIVE SERVICE AWARD,
AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

Pursuant to Federal Rule of Civil Procedure 23(e), Plaintiff Tracy Fry ("Plaintiff" or

"Class Representative"), hereby moves the Court for the entry of an order granting Final

Approval of the class action settlement reached in this case, approving Plaintiff's requested

attorneys' fees and costs, and granting the service award to Plaintiff as Class Representative.

This motion is based on the points and authorities cited in the incorporated Memorandum of Law

in Support, Declaration of Andrew Perry, Declaration of Arthur Olsen, Declaration of Taras

Kick, Declaration of Richard D. McCune, Declaration of Robert Weissman, the arguments of

counsel, the Settlement Agreement, and all files, records and proceedings in this action,

including Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement and

Memorandum of Point and Authorities in Support, and all materials submitted in support thereof.

The hearing is set for February 23, 2018, at 9:30AM. Defendant does not oppose this motion,

and as of the date of this filing, no Settlement Class Member submitted a written objection to the

Settlement Administrator regarding the Notice of Proposed Settlement of Class Action. In

- 1 -

support of this motion, Plaintiff respectfully states the following:

## I.  SUMMARY.

This is a class action alleging that Defendant MidFlorida Credit Union ("MCU" or "Defendant") charged overdraft fees based on the "available balance" in customer accounts (i.e., a subset of the actual account balance from which money has been deducted by placing holds on funds earmarked for pending transactions which have not yet posted) rather than the money actually in the account (sometimes called the "ledger balance"), allegedly in violation of the terms of its contract governing the overdraft program for certain types of transactions.  In this brief, this is referred to as Plaintiff's "sufficient funds" theory.  Plaintiff also alleges that Defendant violated Regulation E, 12 C.F.R. § 1005.17 ("Reg. E"), by enrolling credit union members in its overdraft program for subject transactions without obtaining their affirmative consent to do so based on a complete and valid disclosure of the terms of the program. MCU disputes Plaintiff's contentions.

Following a successful mediation before Peter J. Grilli, and an accepted  mediator's proposal from Mr. Grilli, the parties presented the proposed settlement for preliminary approval, which this Honorable Court granted on July 3, 2017.  (Docket Entry ["DE"] 41.)  Under the proposed settlement agreement, MCU will pay $2,375,000, with no reversion of any residue to MCU. (See Exhibit 1 to the Declaration of Taras Kick ("Kick Decl."), "Settlement Agreement" ["SA"] ¶ 1(r).)   In addition to this monetary settlement, and as a result of this lawsuit, as of January 15, 2016, MCU changed its payment processing systems so that overdrafts are assessed based on members' ledger or actual balance at the time a transaction is presented to Defendant for payment. (SA ¶ 2.)  Plaintiff's database expert, Arthur Olsen, has calculated the savings in overdraft fees from this change in systems at more than $1.15 million per year.  (Declaration of Arthur Olsen ["Olsen Decl."] ¶ 12.)  Over the course of three years, this means an additional savings of about $3.5 million.  Including this savings from the change in practice for three years, the value of the settlement is $5,875,000.

In granting preliminary approval of the settlement on July 3, 2017, this Court preliminarily found that the classes as defined in the Settlement Agreement meet all of the

requirements for certification of a settlement class found in the Federal Rules of Civil Procedure and applicable case law (Preliminary Approval Order, ¶¶ 2, 6), and that the proposed settlement falls within the range of reasonableness for potential final approval, and is the product of arm's length negotiations by experienced counsel.  (*Id*. ¶ 7.)  This Court also found that the proposed plan of notice to class members satisfied due process, and ordered that notice of the proposed settlement be served pursuant to it.  (*Id*. ¶ 8.)

The parties have complied with this Court's Order regarding notice, and Plaintiff therefore now presents the matter for final approval.  As evidenced by the contemporaneously filed declaration of Andrew Perry of the claims administrator Kurtzman Carson Consultants ("KCC"), the direct notice program approved by this Court has been very successful. Specifically, after receiving on October 30, 2017, directly from Defendant the Excel database of class member information and running it through the U.S.P.S. National Change of Address database, on November 10, 2017, the claims administrator caused the court approved Notice Form be mailed to 20,693 Class Members and, on the same date, to be emailed to 11,369 email addresses. (Declaration of Andrew Perry [hereafter "KCC Decl."] ¶¶ 2, 4,5)  Of the 32,062 Class Members that were sent Notice, **97.60%**  ultimately received it. (KCC Decl. ¶ 9.)

Further, not only was the reach of the notice program ordered by this Court very successful, but to date the reaction of class members also has been very positive.  Specifically, as of January 12, 2018, there have been only 7 requests for exclusion, meaning **99.98%** of the class members have elected not to opt out of the proposed settlement before this Court.  (KCC Decl. ¶ 10).  Further, although the time to object has not yet fully expired, to date there have not been any objections at all to the proposed settlement before this Court.  (KCC Decl. ¶ 11.)

As discussed in detail below, the dollar amount of the settlement represents approximately 69.44% of the most likely recovery at trial if the savings from only one year in the change in systems is taken into account, and approximately 46.78% if that additional savings amount is not taken into account,  and every single class member will receive either a direct deposit or check without having to make a claim, and also while avoiding for the class members all of the risks and further costs that would have been incurred had this litigation continued.

(Kick Decl. ¶¶ 13-14.)   In sum, as detailed further below, the proposed settlement satisfies all criteria for final approval.

## II.    THE HISTORY OF THIS CASE.

The Complaint in this action was filed on November 24, 2015 (Docket No. 1 "Complaint"), alleging that MCU had breached its contracts with its customers and violated Reg. E by charging overdraft fees for transactions which, to be completed, required less money than was already in the customers' actual or ledger balances.  (Complaint, ¶ 1, ¶¶ 16-20.)  On January 14, 2016, MCU filed an Answer to the Complaint, denying the claims alleged in the Complaint and raising several affirmative defenses.  (Docket No. 15.)

On August 11, 2016, Plaintiff propounded on MCU its first set of requests for production of documents, comprised of 86 categories of documents, its first set of special interrogatories, comprised of 23 special interrogatories, and its first set of requests for admissions, comprised of 12 requests for admission.  (Kick Decl. ¶ 7.)  Defendant responded to the requests for production on August 2, 2016, and to the special interrogatories and requests for admission on October 20, 2016.  On May 18, 2016, Plaintiff propounded on MCU its second set of requests for production, comprised of 11 additional requests for production, to which Defendant responded on October 20, 2016.  (Kick Decl. ¶ 7.)  On February 28, 2017, MCU took the deposition of Plaintiff, and on March 2, 2017, Plaintiff took the deposition of MCU's corporate representatives designated as most knowledgeable on overdraft issues, Ashley Ely and Mark Gray, in Lakeland, Florida.  (*Id.*)

The parties began settlement negotiations, which at all times were at arm's length, adversarial and devoid of any collusion.  (Kick Decl. ¶ 10.).  Pursuant to these negotiations, on March 20, 2017, the parties participated in a mediation before Peter J. Grilli, which resulted in an agreement to settle the claims alleged in the Complaint through a mediator's proposal made by Mr. Grilli.  (Kick Decl. ¶ 10.)  As part of the due diligence related to the settlement,  Plaintiff's database expert, Arthur Olsen, received access to MCU's  database.  (*See* Declaration of Arthur Olsen In Support of Motion For Preliminary Approval ["Olsen Prelim. Decl.", DE 40-4] ¶ 6.)

Subsequent to this Honorable Court's Order granting preliminary approval, at Class Counsel's request, Mr. Olsen has spent very substantial additional time working with and

- 4 -

analyzing the actual data in this case, including travelling from Seattle, Washington to the credit union's headquarters in Lakeland, Florida.  (Olsen Decl. ¶¶  8, 9; Kick Decl. ¶ 8.).  Specifically, Mr. Olsen flew from Seattle, Washington to MCU's headquarters in Lakeland, Florida on October 11, 2017, and spent approximately two days on-site working with MCU's team and analyzing the relevant data.  (*Id.*)  Mr. Olsen was able to conclude from his work with the actual data in this case that the $4,706,280, and that the savings from the change in practices resulting from this lawsuit is $1,150,000 per year.  (Olsen Decl. ¶¶ 10, 12.)

## III.    THE TERMS OF THE SETTLEMENT.

### 1.    Class Definition.

The class includes any member of MCU who, between November 24, 2010 and January 15, 2016, was assessed an overdraft fee when the member had sufficient money in his or her ledger balance, but insufficient money in his or her available balance to complete the transaction that caused the fee.  (SA ¶ 1(e).)  Mr. Olsen has determined there are 32,086 members in the class.  (Olsen Decl. ¶ 11.)

### 2.    Monetary Payment.

Pursuant to the terms of the Settlement, Defendants will pay $2,375,000 into a settlement fund, which will be set up by a third-party administrator and used to pay class members directly.  (SA ¶¶ 1(r), 8.)  As the settlement does not require any claims to be made by the class members, they need not take any action to receive payment.  (SA ¶ 8.) The settlement fund will also be used to pay claims and notice administration costs, and to pay for attorney fees and litigation costs as approved by this Court. (SA ¶ 8.)

### 3.    Change in Systems For Future Overdraft Fee Assessments.

As of January 15, 2016, as a result of this lawsuit, MCU changed its payment processing systems so that overdrafts are assessed based on a member's ledger or actual balance at the time a given transaction is presented for payment, rather than using the available balance.  (SA ¶2.) To date, this already has resulted in a  savings of $1,150,000 of overdraft fees, meaning with the $2,375,000, a settlement value to date of $3,525,000. (Olsen Decl. ¶ 12.)  For three years, the savings in overdraft fees would in reality exceed $3,500,000 as a result of continued asset growth

- 5 -

as calculated by Mr. Olsen (Olsen Decl. ¶ 12), or a value of settlement of $5,875,000. As a result of this lawsuit, Defendant also modified its member disclosures to reflect this practice, including a description of the balances in member accounts, how overdrafts are determined and how payment transactions are processed. (SA ¶2.)

>     5.     **Payments to Claimants.**

No class member will need to make a claim. (SA, ¶ 8(d)(v).) The amount paid to each class member shall be calculated as follows: (Net Settlement Fund / Total Improper Overdraft Charges) x Total Improper Overdraft Charge per Class Member = Individual Payment. (SA ¶ 8(d)(iv)). This means each class member will be treated fairly by receiving a proportionate share of his or her "sufficient fund" overdraft fees refunded as a result of this settlement. Class members who remain MCU members at the time of the distribution will receive a credit to their checking accounts in the amount of the Individual Payment. (SA ¶ 8(d)(v)(1).) If they do not have a checking account, but maintain another account at Defendant, then that account shall be credited. (*Id*.) Class Members who are not members of Defendant at the time of the distribution of the Net Settlement Fund shall be sent a check by the claims administrator to the address to which the class notice was sent, discussed *infra*, or at such other address as designated by the Class Member. (SA ¶ 8(d)(v)(2)).

>     6.     *Cy Pres* **Distribution.**

Under no circumstances will any of the money from this settlement revert to MCU. (SA ¶ 8(d)(vi).) Rather, if there is any residue which remains in the Net Settlement Fund after all class members who made valid claims have been paid the amount to which they are entitled, subject to this Honorable Court's approval the settlement provides for a *cy pres* distribution of such residue to Public Citizen, a non-profit organization devoted to protecting consumer rights. (SA ¶ 11.) The declaration of the President of Public Citizen, Robert Weissman, is filed concurrently with this motion and further explains why it is an appropriate *cy pres* for a case like this.

## III.   LEGAL ANALYSIS.

### A.     The Settlement Should Be Finally Approved.

The Eleventh Circuit has recognized that "…in order to approve a settlement the district

court must find that it 'is fair, adequate and reasonable and is not the product of collusion between the parties.'" *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984; *see also Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 537 S.D. Fla. 1988) ("This conclusion is based upon an analysis of the law surrounding fair and reasonable settlements and a finding that no collusion existed between the parties with respect to the settlement"). "Determining the fairness of the settlement is left to the sound discretion of the trial court." *Bennett*, 737 F.2d at 986; *see also Behrens*, 118 F.R.D. at 538. "This rule is founded upon the policy that a trial judge is in the best position to evaluate the settlement because he is directly exposed to the litigation." *Id.* (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 454 (2d Cir. 1974).)

### 1.    The Law Favors the Settlement of Class Actions.

The Eleventh Circuit recognizes a "strong judicial policy favoring settlement," while expressing "the realization that compromise is the essence of settlement." *Bennett*, 737 F.2d at 986; *see also Behrens*, 118 F.R.D. at 538 ("When exercising its discretion, a court should always review the proposed settlement in light of the strong judicial policy that favors settlements.") (citing *In re Chicken Antitrust Litigation*, 669 F.2d at 238).   "This policy has special importance in class actions with their notable uncertainty, difficulties of proof, and length." *Behrens*, 118 F.R.D. at 538 (citing *Cotton*, 5f59 F.2d at 1331); *see also United States Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits."); *Raines v. Florida*, 987 F. Supp. 1416, 1418 (N.D. Fla. 1997).

"Settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits." *Pierre-Val v. Buccaneers Ltd. Partn.*, 2015 WL 3776918, at *1 (M.D. Fla. June 17, 2015) (quoting *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977).

### 2.    The Settlement Resulted from Arm's Length Negotiations and Was Not the Product of Collusion.

Courts may approve settlements that are "fair, adequate, and reasonable, and . . . not the product of collusion between the parties." *Behrens*, 118 F.R.D. at 538; *see also Bennett*, 737 F.2d at 986 (supporting approval of settlement where "there was no fraud or collusion in arriving

at the settlement").  Further, where no fraud or collusion is evident, "the court is not called upon to decide the merits of the claims made on behalf of the class members or to decide whether, or to what extent, the defendants are liable to all or any of the class members," *Woodward v. Nor-Am Chem Co.*, 1996 U.S. Dist. LEXIS 7372 at *49 (S.D. Ala. 1996), and instead, "the district court's most important function in reviewing compromise of class actions is its consideration of the settlement terms." *Id*. at *50 (quoting *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981).

The negotiations for the settlement at bar not only were conducted at arm's length by experienced counsel and were devoid of collusion, but the settlement is actually the result of a mediator's proposal made by Peter J. Grilli at mediation of this matter which was accepted by both sides.  (Kick Dec. ¶ 10.)  As such, there is no doubt this settlement was at all times arm's length, and it therefore carries a presumption of fairness.  Where there "is no evidence of any kind that the parties or their counsel have colluded or otherwise acted in bad faith in arriving at the terms of the proposed settlement . . . counsel's informed recommendation of the agreement is persuasive that approval is appropriate." *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688 (M.D. Fla. 2005) at 703.  Both Class Counsel are in favor of this proposed settlement and recommend it. (McCune Decl. ¶ 20; Kick Dec. ¶ 15.)

### 3.    The Applicable Factors Support Approval of the Settlement

In *Bennett*, the Eleventh Circuit Court of Appeal approved the district court's consideration of the following factors in determining whether to finally approve a class action settlement:  "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." *Bennett*, 737 F.2d at 986; *see also Behrens*, 118 F.R.D. at 538-39 (setting forth these same factors).  "In evaluating these considerations, the district court should not try the case on the merits." *Behrens*, 118 F.R.D. at 539 (citing *Cotton*, 559 F.2d at 1330).  "The court can rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its

own judgment for that of counsel." *Id*. (quoting *Cotton*, 559 F.2d at 1330.

     **a.**     **The Likelihood of Success at Trial Supports Approval of the Settlement.**

"By far the most important factor in evaluating the fairness and adequacy of a settlement is the likelihood and extent of any recovery from the defendants absent the settlement." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 314; *see also Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974) (same). "The Court, however, has neither the duty nor the right to reach any ultimate conclusions on the issues of fact or law which underlie the merits of the dispute. *Id*. (citing *Cotton*, 559 F.2d at 1330).

While Plaintiff believes that she has a strong case on the merits and for class certification, her case did present many risks which counsel in favor of settlement. (Kick Decl. ¶¶ 13, 14, 15.) If the settlement is not approved, Plaintiff would next face the hurdle of an adverse motion for class certification, with an uncertain outcome. (*Id.*) If Plaintiff prevailed, she would next face a motion for summary judgment, also with an uncertain outcome. (*Id.*) Next, Plaintiff, if successful, would face a trial on the merits. The Defendant would argue that the contract language on which Plaintiff relies does not actually contradict its practice of assessing overdraft fees based on the available balance, and Defendant would also argue, as Defendant's counsel has argued in other cases, that Defendant's conduct was protected from liability under the Electronic Fund Transfer Act by a safe harbor clause, and that the EFTA's one-year statute of liability forecloses liability for many of the class members' otherwise unlawful fees. (*Id.*)

Thus, while Plaintiff believes her case is strong, she faced significant risks going forward.

     **b.**     **The Settlement Falls Within the Range of Possible Recovery that is Fair to the Class.**

"In assessing the settlement, the Court must also establish the range of possible damages that could be recovered at trial and then combine this assessment with plaintiffs' likelihood of prevailing at trial and other relevant factors to determine whether the settlement falls at a point in the range that is fair to the class." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 319. "[T]he fact that a proposed settlement amounts only to a fraction of the potential recovery does

not mean the settlement is unfair or inadequate." *Behrens*, 118 F.R.D. at 542 (citing *Grinnell Corp.*, 495 F.2d at 455 n.2). Class Counsel believes the most likely recovery at trial should the class prevail would have been the sufficient funds damages, and database expert Arthur Olsen has established that the possible recovery for overdraft fees assessed on a positive balance, which is Plaintiff's sufficient funds theory of relief, is $4,706,280. (Kick Decl. ¶ 15; Olsen Decl. ¶ 10.) If only one year in savings is considered from the change in practices, which is the amount of time which already has passed, then the settlement value is $3,525,000.[1] This represents 74.9% of the total possible recovery on a sufficient funds theory.

Courts in this Circuit have determined that settlements are, of course, reasonable where plaintiffs recover only part of their actual losses. *See Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988), *aff'd* 899 F.2d 21 (11th Cir. 1990) ("[T]he fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate"). Indeed, "[a] settlement can be satisfying even if it amounts to a hundredth or even - a thousandth of a single percent of the potential recovery." *Id.*; *see also City of Detroit v. Grinnell Corp.*, 356 F. Supp. 1380, 1386 (S.D.N.Y. 1972) (a recovery of 3.2 % to 3.7 % of the amount sought is "well within the ball park"), aff'd in part, rev'd on other grounds, 495 F.2d 448 (2d Cir. 1974); *Martel v. Valderamma*, 2015 U.S. Dist. LEXIS 49830 * 17 (C.D. Cal. 2015) (approving a settlement of $75,000 when potential damages were $1.2 million, or about 6%); *In re Toys R US FACTA Litig.*, 295 F.R.D. 438, 453 (C.D. Cal. 2014) (approving settlement with *vouchers* (not cash like here) potentially worth a maximum of three percent (3%) *if all possible voucher claims were actually made*.

### c.   The Point On or Below the Range of Possible Recovery at Which a Settlement is Fair, Adequate, and Reasonable.

"In assessing the settlement, the Court must determine 'whether it falls within the range

---

[1] The "value of settlement" is also defined in the Settlement Agreement as the amount of the new money payment plus one year's of savings on overdraft fees from the change in practices. (SA ¶ 1(s).)

of reasonableness, not whether it is the most favorable possible result in the litigation.'"  *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 319 (quoting *Fisher Brothers v. Cambridge-Lee Indus.*, 630 F. Supp. 482, 489 (E.D. Pa. 1985)).  As the Fifth Circuit explained in *Cotton*:

> [I]t [should not] be forgotten that compromise is the essence of settlement.  The trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes."

*Cotton*, 559 F.2d at 1330.

As noted, the "value of the settlement" represents 74.9% of the total possible recovery on a sufficient funds theory.  Even with no risks this percentage would fall above the range of possible recovery at which a settlement is fair, adequate, and reasonable.

> **d.    The Complexity, Expense, and Duration of Further Litigation Supports Approval of the Settlement.**

"The law favors compromises in large part because they are often a speedy and efficient resolution of long, complex, and expensive litigations."  *Behrens*, 118 F.R.D. at 543.  Continued litigation would be complex, expensive, and of significant duration.  (Kick Decl. ¶¶ 13-15.)  As noted, if the settlement is not approved, Plaintiff will next file a motion for class certification, which would be opposed by Defendant, and would require complex and lengthy analysis.  Next, Defendant would likely file, and Plaintiff would oppose, a motion for summary judgment.  If successful, Plaintiff would next prepare to try the case on its merits at trial.  Throughout, the parties would argue complex issues related to contractual interpretation and the construction of Regulation E.  Doing so would be expensive, involving additional hundreds of thousands, if not millions, of legal fees, and lengthy, spanning an additional year or more.  (*Id.*)

> **e.    The Reaction of the Class Supports Approval of the Settlement.**

"The small number of objectors is a good indication of the fairness of the settlement."  *Whitford*, 147 F.R.D. at 141.  The reaction to the settlement to has been overwhelmingly favorable as  99.98% of the class members have elected not to opt out, and the time to opt out has long since passed.  (KCC Dec. ¶ 10.) Further, although the time to object has not yet expired,

to date no class member has objected.  (Perry Dec. ¶ 11.)  This is an extremely positive reaction.

### f.    The Stage of the Proceedings Supports Approval of the Settlement.

Approval is appropriate where, as here "[t]he plaintiff's success at trial could not be guaranteed." *Behrens*, 118 F.R.D. at 539.  Further, while meaningful discovery has taken place here, including 30(b)(6) depositions, the deposition of the class representative, and written discovery (Kick Decl. ¶¶ 7, 8), worth noting is this is not even a prerequisite to approval of a settlement: "[w]e are not compelled to hold that formal discovery was a necessary ticket to the bargaining table." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981).  Here, however, the parties have conducted meamiingful discovery, both formal and informal, including Plaintiff's database expert spending two days at MCU's headquarters. (*Id.*)

### B.    The Notice to the Class Satisfies Due Process

In a class action, due process requires that notice of the settlement be given to all absent class members, and that they be afforded an opportunity to be heard.  *Mahburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 667 (M.D. Ala. 1988) ("The Court is of the opinion that the notice given to members of the plaintiff class by publication and by mail, as aforesaid, complied with all the requirements of due process, all requirements of Rule 23 of the Federal Rules of Civil Procedure, and constituted the best practicable notice under the circumstances.")  Here, the notice, which was approved by the Court, was mailed and emailed in accordance with this Court's Order granting preliminary approval, with a successful reach rate of **97.60%**.  (KCC Dec. ¶ 9.)  The notice approved by this Court described the terms of the settlement, as well as the attorneys' fees and costs sought, included the contact information for Plaintiff's counsel, contained a brief explanation of the reasons why the parties propose the settlement, and stated the rights and options of the class members related to the settlement.  Accordingly, it fairly informed the class members of the settlement and their rights regarding the settlement.

### C.    The Court Should Approve the Plan of Allocation

"A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable." *White v. NFL*, 822 F. Supp. 1389, 1420-24 (D. Minn. 1993), *aff'd* 41

F.2d 402 (8th Cir. 1994). The proposed reimbursement plan does just that: each plaintiff is reimbursed for his or her *pro rata* share of the overdraft fees, based on the number of fees he or she has received. SA ¶ 8(d)(iv)). Each class member is being treated identically, receiving his or her portion of the fund which is proportional to the amount of improper fees he or she paid. Further, the class members need not come forward to make claims—the money will be distributed to them directly with no obligation for action. (SA, ¶ 8(d)(v).) Accordingly, the plan of allocation should be approved.

        **D.**      **The Court Should Approve the Requested Attorneys' Fees.**

    The Eleventh Circuit held in 1991 that courts should no longer use the lodestar method in common fund cases, and, instead, should use what is known as the percentage-of-the-fund method: "Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I Condo. Ass'n v. Dunkle*, 946 F. 2d 768, 774 (11th Cir. 1991.) "[A] percentage of the fund approach should be the method utilized in most common-fund cases, with the percentage being based on both the monetary and nonmonetary value of the judgment or settlement." (*Principles of the Law of Aggregate Litigation*, § 3.13(b) (American Law Institute, 2010).)

    Plaintiff applies here for attorneys' fees of $1,125,000 pursuant to a percentage of the fund methodology per *Camden I*. This fee request is 31.9% of the $3,525,000 "value of settlement" as defined in the Settlement Agreement, which is based on one year of savings in overdraft fees of $1,150,000 and the $2,375,000 payment. (SA ¶¶ 1(r)(s).) Since the definition in the Settlement Agreement artificially agreed to limit the quantification of the "value of settlement" to only one year in savings from the change in practices, in reality, if two years were considered this means a value of $4,650,000 and a percentage requested of only 24%, and if three years are considered, this means a value of $5,875,000 and percentage requested of only 19%. (Olsen Decl. 12.)

    "Lawyers who recover a 'common fund' are entitled to reasonable attorneys' fees from the fund they created." *Pinto v. Princess Cruise Lines*, 513 F. Supp. 2d 1334, 1338 (S.D. Fla. 2007) (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S. Ct. 745, 62 L. Ed. 2d 676

(1980)). "One rationale for such awards is that 'persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched.'" *Id.* (quoting *Boeing*, 444 U.S. at 478). "The common fund approach is also grounded on a policy of encouraging counsel to act as 'private attorneys general' to vindicate the rights of class members, most of whom have small individual claims." *Id.* That rationale has been described as follows:

> [C]ourts also have acknowledged the economic reality that in order to encourage "private attorney general" class actions brought to enforce . . . laws on behalf of persons with small individual losses, a financial incentive is necessary to entice capable attorneys, who otherwise could be paid regularly by hourly-rate clients, to devote their time to complex, time-consuming cases for which they may never be paid.

*Mashburn v. National Healthcare, Inc.*, 684 F. Supp. 679, 687 (M.D. Ala. 1988.

In *Camden I, supra.,* the Eleventh Circuit, in addition to establishing that "in this circuit, attorneys' fees awarded from a common fund shall be based on a reasonable percentage of the fund established for the benefit of the class," also indicated that courts should consider the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), which Class Counsel now reviews.

      a.      **The Contingent Nature of the Fee, the Financial Burden Carried by Class Counsel, and the Economics of Prosecuting a Class Action Support the Requested Award.**

"A determination of a fair fee for Class Counsel must include consideration of the contingent nature of the fee, the wholly contingent outlay of out-of-pocket sums by Class Counsel, and the fact that the risks of failure and nonpayment in a class action are extremely high." *Pinto*, 513 F. Supp. 2d at 1339 (citing *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir. 1981) ("Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result.").

Here, counsel took the case at bar on a wholly contingent basis, with no guarantee that it would receive any whatsoever, or that any of its costs outlaid in this matter would be reimbursed, accepting a substantial risk of loss. (McCune Decl. ¶¶ 11, 12; Kick Dec. ¶ 5.) In so doing, counsel turned down other non-contingent work that it could have accepted. (*Id.*)

b.     **The Requested Fee Reflects the Market Rate in Other**

**Complex, Contingent Litigation.**

As the court explained in *Pinto*:

> In private litigation, attorneys regularly contract for contingent fees between 30% and 40% directly with their clients. (*See Engel Aff.* [D.E. 937] P 19). *Phemister v. Harcourt Brace Jovanovich, Inc.*, 1984 U.S. Dist. LEXIS 23595, 1984-82 Trade Cas. (CCH) P 66,234, at 66,995 (N.D. Ill. 1984) ("Contingent fee arrangements in non-class action damage lawsuits are the simple method of paying the attorney a percentage of what is recovered for the client. The more the recovery, the more the fee. The percentages agreed on vary, with one-third being particularly common."); *Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir. 1986)  (observing that "40% is the customary fee in tort litigation" and noting, with approval, contract providing for one-third contingent fee if litigation settled prior to trial). These percentages are the prevailing market rates throughout the United States for contingent representation.

513 F. Supp. 2d at 1341.  In common fund cases, the Eleventh Circuit has observed that "an upper limit of 50% of the fund may be stated as a general rule, although even larger percentages have been awarded."  *Camden I*, *946* F.2d at 774-75.  The fee sought here is 31.9% of the value of settlement. It is common for fees of one-third or more to be awarded in a case such as this, including in the 11th Circuit in cases with far higher amounts. *In re: Terazosin Hydrochloride Antitrust Lit.*, 99-1317- MDL-Seitz (S.D. Fla. April 19, 2005) (awarding fees of 33.3% on settlement of over $30 million); *In re: Managed Care Litig. v. Aetna*, MDL No. 1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) (awarding fees and costs of 35.5% on settlement of $100 million); *Gutter v. E.I. Dupont De Nemours & Co.*, 95-2152-Civ-Gold (S.D. Fla. May 30, 2003) (awarding fees of 33.3% on settlement of $77.5 million); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999) (affirming fee award of 33.3% on settlement of $40 million);  *see also*, *Ressler*, 149 F.R.D. at 655 (reviewing fee awards in similar case citing, among other cases); *Zinman v. Aemco Corp.*, 1978 U.S. Dist. LEXIS 20079 (E.D. Pa. 1978) (fee equal to 50% of recovery); *Howes v. Atkins*, 668 F. Supp. 1021 (E.D. Ky. 1987) (fee equal to 40% of recovery); *Van Gemert v. Boeing Co.*, 516 F. Supp. 412 (S.D.N.Y. 1981)  (fee equal to 36.2%).[2]

---

[2]  Other cases include, *In re U.S. Bancorp Litig.* (8th Cir. 2002) 291 F.3d 1035, 1037 [finding no abuse of discretion in 36% fee award];  *In re Bayou Sorrel Class Action* (W.D. La. 2006) 2006 U.S. Dist.LEXIS 80924, *21-22 [awarding fees representing 36% of the common fund]; *Carlson v. C.H. Robinson Worldwide* (D. Minn. 2006) 2006 U.S.Dist.LEXIS 67108, *21-22 [35%];

Similar awards to that sought here have also recently been awarded in other overdraft fee class actions against credit unions prosecuted by Class Counsel, recognizing the complexity of a case such as this and the appropriateness of the fee requested. *See, e.g.*, *Ketner v. SECU Maryland*, Civil No.: 1:15-CV-03594-CCB (D. MD. 2017) (final approval granted January 11, 2018, in federal consumer class action in the District of Maryland regarding alleged improper overdraft fees by a credit union, with issues similar to this case, attorneys' fees awarded of one-third); *Towner v. 1st MidAmerica Credit Union*, No. 3:15-cv-1162 (S.D. Ill. 2017) (final approval granted November 9, 2017, in federal consumer class action regarding alleged improper overdraft fees by a credit union, with issues similar to this case, attorneys' fees awarded of one-third); *Lane v. Campus Federal Credit Union*, Case No. 3:16-cv-00037 (final approval granted in August 2017, with fees awarded of one-third).[3]

### c.     The Novelty and Difficulty of the Questions at Issue.

"Class action matters are generally complex," *Pinto*, 513 F. Supp. 2d at 1342; this one is particularly so. The parties faced novel interpretations of two contracts and the interplay between those contracts and a federal regulation, as well as the construction of that regulation as applied to the charging of overdraft fees against consumer bankers. There were issues of interpretation of a Regulation by the Consumer Financial Protection Bureau, possible arguments of federal preemption, issues pertaining to tolling. (Kick Decl. ¶¶ 14-15.) Other federal courts across the country have recognized the complexity of the issues in overdraft cases prosecuted by

---

*Worthington v. CDW* (S.D. Ohio 2006) 2006 U.S.Dist.LEXIS 32100, *22 ["Counsel's requested percentage of 38 and one-third of the total gross settlement"]; *In re Franklin Nat'l Bank Sec. Litig.*, 1980 U.S. Dist. LEXIS 17277 (E.D.N.Y. 1980) (fee equal to 34%).)

[3] Other overdraft fee cases prosecuted by Class Counsel involving issues similar to this case in which a one-third fee was awarded by the court include *Gray v. Los Angeles Federal Credit Union*, Los Angeles County Superior Court, Case No. BC625500 (final approval granted in June 2017, attorneys' fees awarded of one-third); *Moralez v. Kern Schools Federal Credit Union*, Kern County Superior Court, Case No. BCV-15-100538 (final approval granted in June 2017, attorneys' fees awarded of one-third); *Manwaring v. Golden 1 Credit Union*, Sacramento County Superior Court, Case No. 34-2013-00142667 (final approval granted in December 2015, attorneys' fees awarded of one-third); *Casey v. Orange County Credit Union*, Orange County Superior Court No. 30-2013-00658493-CJ-BT-CXC (final approval granted by the court in May 2015, attorneys' fees awarded of one-third).

Class Counsel in awarding a fee of one-third.  (Kick Decl. ¶ 3.)

        **d.**       **The Skill, Experience and Reputation of Class Counsel.**

The qualifications of Class Counsel are set forth in the Declarations of Richard McCune and Taras Kick.  As is evident, both Mr. McCune and Mr. Kick have been appointed class counsel in numerous consumer class actions, and have successfully tried consumer class actions to judgment.  (McCune Decl. ¶¶ 3-5; Kick Dec. ¶¶ 2-3.)  Further, both have very substantial experience and expertise particularly with overdraft fee class actions.  (*Id.*)  Finally, the quality, skill, and efficiency of the attorneys involved in this case are perhaps best illustrated by the excellent result that Class Counsel have obtained for the class members.

        **e.**       **The Result Achieved for the Class.**

The results obtained for the class are excellent by any measure:  a payment of $2,375,000 into a common fund, in combination with a very real change in practice worth $1.15 million per year, meaning a value to date of $3,525,000, and continuing to increase by $1,150,000 per year, as well as improved disclosures.  Further, as already explained, no class member will need to submit a claim, or do anything, to receive payment, and no money will revert to Defendant.

        **f.**       **The Reaction of the Class.**

"A small number of objections indicates the support of the Class." *Pinto v. Princess Cruise Lines*, 513 F. Supp. 2d at 1343.  Here, the reaction of the class to date has been overwhelmingly favorable.  99.98% of class members, meaning all but 7, have elected not to opt out of the proposed settlement, and no class member to date has filed any objection. (KCC Decl. ¶¶ 10, 11.)  "That this sizeable class did not give rise to a single objection on the fees request further justifies the full award." *Id*.

        **E.**       **The Court Should Award the Requested Cost Reimbursement.**

Class Counsels' costs, which have been enumerated in the Declarations of Richard McCune and Taras Kick total $80,030.01.  (McCune Decl. ¶ 17; Kick Dec. ¶ 11.)  Additionally, Class Counsel estimate another $600 (six hundred dollars) for roundtrip travel from California to Florida for the final approval hearing, including one night's hotel stay, for a total of $80,630.01 expended by Class Counsel in litigation costs in this matter. (*Id.*) However, Class Counsel

promised in the Motion for Preliminary Approval to cap its litigation costs in this matter at $65,000, and the Notice sent to class members stated Class Counsel would cap its litigation costs at $65,000.  Therefore, Class Counsel seeks only reimbursement of $65,000 of its litigation costs, even though this will mean a loss of more than $15,000 in litigation costs paid by Class Counsel to prosecute this case.

### F.  The Court Should Approve the Class Representative Service Award.

The proposed class representative service award is $10,000 and is within the range of reasonableness.  *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (approving service awards of $300,000); *Zolkos v. Scriptfleet, Inc.,* 2015 U.S. Dist. LEXIS 91699, at *8 (N.D. Ill. 2015) (approving a representative service award of $10,000); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 973 (E.D. Tex. 2000) (approving $25,000 incentive awards to both named plaintiffs).  The class representative in this case was very helpful to the case's success, including taking time to sit for an adverse deposition, to prepare in advance for it, and to provide documents, and be available and participate in  numerous discussions. (Kick Decl. ¶12.).

### G.  The Settlement Class Should Be Finally Certified.

Class certification is proper if the proposed class, the proposed class representative, and the proposed class counsel satisfy the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a).  Fed. R. Civ. P. 23(a)(1-4).  In addition to meeting the requirements of Rule 23(a), a plaintiff seeking class certification must also meet at least one of the three provisions of Rule 23(b).  When a plaintiff seeks class certification under Rule 23(b)(3), the representative must demonstrate that common questions of law or fact predominate over individual issues and that a class action is superior to other methods of adjudicating the claims.  Fed. R. Civ. P. 23(b)(3); *Amchem Prods. v. Windsor*, 521 U.S. 591, 615-616 (1997).  Plaintiff meets all of the Rule 23(a) and 23(b)(3) requisites. Certification is therefore proper.

### 1.  The Requirement of Numerosity is Satisfied.

The first prerequisite of class certification is numerosity, which requires "the class [be] so numerous that joinder of all members is impractical."  Fed. R. Civ. P. 23(a)(1).  In this case, there are 32,086 class members.  (Olsen Decl. at ¶ 11.)  There is no specific number of class

members required, though the numerosity requirement is typically satisfied when the class

comprises at least forty members.  *Cox v. American Cast Iron Pipe Co*, 784 F. 2d 1546, 1553

(11th. Cir. 1986) ("more than forty [is] adequate…").

      2.     **The Requirement of Commonality is Satisfied.**

     The second requirement for certification requires that "questions of law or fact common

to the class" exist.  Fed. R. Civ. P. 23(a)(2).  Commonality is demonstrated when the claims of

all class members "depend upon a common contention . . . that is capable of classwide

resolution."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  This requires that the

determination of the common question "will resolve an issue that is central to the validity of each

one of the claims in one stroke."  *Id.*  "Even a single common question will do."  *Dukes*, 131 S.

Ct. at 2556.  In other words, commonality exists where a question of law linking class members

is substantially related to resolution of the litigation even where the individuals may not be

identically situated.  *Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689, 693 (S.D. Fla.

2010) (Establishing commonality "'is a relatively light burden' that 'does not require that all the

questions of law and fact raised by the dispute be common . . . or that the common questions of

law or fact predominate over individual issues.'") (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d

1256, 1268 (11th. Cir. 2009)); *see also Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355

(11th Cir. 2009) ("Commonality requires that there be at least one issue whose resolution will

affect all or a significant number of the putative class members.")

     Here, not only do there exist common questions of law or fact, the common questions

predominate over any individual ones.  The theories underlying the class claims involve a

uniform overdraft fee practice and uniform contractual terms.  It is undisputed that Defendant

uniformly and systematically used the "available balance" to determine whether to assess an

overdraft fee on a transaction, as opposed to utilizing the actual money in the account, i.e., the

"ledger balance" or "actual balance".  Therefore, answering whether Defendant breached its

contract terms in doing that will by definition predominate for all class members. Additionally,

it is also undisputed that the operative terms regarding the overdraft fee program, and

specifically the balance calculation to be used to determine the assessment of overdraft fees, as

set forth in the Opt-In Contract (e.g. enough money in the account to cover a transaction) were provided to all class members.  (Complaint at ¶¶ 17, 18.)

As such, the commonality requirement is satisfied.

### 3.    The Requirement of Typicality is Satisfied.

Rule 23 next requires that the class representative's claims be typical of those of the class members.  Fed. R. Civ. P. 23(a)(3).  "Clearly, the threshold for typicality is low and Rule 23(a)(3) criterion serves one simple purpose: to assure that the named representatives' interests are aligned with those of the class." *Singer v. AT & T Corp.*, 185 F.R.D. 681, 689 (S.D. Fla. 1998) (internal citations omitted). Typicality has been shown where the claims "of the class and class representatives arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984 "However, typicality does not require that the class representatives' claims be identical to those of class members, and differences in damages will not destroy typicality." *Grillasca v. Hess Corp.*, 2007 U.S. Dist. LEXIS 53356, at *33 (M.D. Fla. 2007).

Plaintiff's claims are not only typical of those of the other putative class members, they are virtually indistinguishable.  There is no dispute that Plaintiff entered into the uniform and standardized Opt-In Contract and that she was assessed overdraft fees when there was enough money in the account (i.e., the ledger balance) to complete the requested transaction.  At a minimum, this occurred on December 26, 2014, when she was assessed a $30 overdraft fee on a transaction, despite the fact that her account contained sufficient funds to complete the transaction.  (Complaint ¶ 23.)  Plaintiff also alleges the same legal theories as the rest of the class of breach of contract/breach of the covenant of good faith and fair dealing and violation of Regulation E.  Therefore, typicality is satisfied.

### 4.    The Requirement of Adequate Representation is Satisfied.

The final Rule 23(a) prerequisite requires that the proposed class representative has and will continue to "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To support a finding of adequacy, "[t]he proposed Class Representatives must meet a two-part test: First, there must be a commonality of interest between the Representatives and the

class, and, second, there must be qualified attorneys representing the class, with vigorous participation by the Class Representatives." *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 605 (S.D. Fla. 2003). "Adequacy of representation is presumed unless there is evidence to the contrary." *Id*. As with the typicality requirement, adequacy requires that the interests of the named plaintiffs are aligned with the unnamed class members to ensure that the class representative has an incentive to pursue and protect the claims of the absent class members. *See Amchem*, 521 U.S. at 626 n. 20, 117 S.Ct. 2231 ("The adequacy-of-representation requirement 'tends to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'") (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n. 13 (1982)).

As stated, proposed Class Counsel, Richard McCune of McCune Wright Arevalo, LLP, and Taras Kick of The Kick Law Firm, APC, both have significant class action, litigation, and trial experience, are competent, and have been competent in representing the Classes. (McCune Decl. at ¶¶ 2-5; Kick Decl. at ¶¶ 2-3.) Both law firms representing the putative class have extensive experience in consumer class actions, and in particular, expertise in overdraft fee litigation. (*Id*.) The interests of Plaintiff Tracy Fry are not antagonistic to those of the other Class members; her interests are wholly aligned because she was charged overdraft fees when her account had a positive ledger balance. (Kick Decl. ¶ 12.) Further, she understands that she is pursuing this case on behalf of all class members similarly situated and understands she has a duty to protect the absent Class members. (Declaration of Tracy Frye In Support of Motion For Preliminary Approval, DE 40-6, ¶¶ 2, 3; Kick Decl. at ¶ 12.) She has actively participated in the litigation by frequently conferring with class counsel about the case and its status, assisting class counsel by gathering documents and other information, testifying at deposition, and being prepared and willing to testify at trial on behalf of the class if necessary. (*Id*.)

### 5.    The Implied Requirement of Ascertainability is Satisfied.

The Eleventh Circuit has held that "[b]efore a district court may grant a motion for class

certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is 'adequately defined and clearly ascertainable.'" *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)).  Here, the class is clearly ascertainable, as its exact constituency already has been determined and is comprised of 32,086 already ascertained class members.  (Olsen Decl. at ¶ 11.)

> **6.    The Proposed Settlement Class Also Meets the Requirements of Rule 23(b)(3).**

Once the prerequisites of Rule 23(a) have been met, a plaintiff must also demonstrate that she satisfies the requirements of Rule 23(b).  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004). To certify a class under Rule 23(b)(3), the plaintiff must show that (1) the common questions of law and fact predominate over questions affecting only individuals and (2) the class action mechanism is superior to other available methods for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3); *Klay*, 382 F.3d at 1250-51.

> **a.    Common Questions of Law and Fact Predominate.**

The predominance requirement questions whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  "Under Rule 23(b)(3), 'it is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions.'" *Klay*, 382 F.3d at 1254 (11th Cir. 2004) (quoting *In re Theragenics Corp. Secs. Litig.*, 205 F.R.D. 687, 697 (N.D. Ga. 2002)).  "Common issues of fact and law predominate if they 'have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Id.*

The Eleventh Circuit has opined that "if common issues truly predominate over individualized issues in a lawsuit, then 'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.'" *Id.* (quoting *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 322 (5th Cir. 1978)).  "Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important." *Id.*  "If, on the other hand, the

- 22 -

addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate." *Id.* As the Supreme Court most recently confirmed:

> When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016). Both the contract claims and violation of Regulation E claims are subject to common proof, and would be subject to the same common proof if additional plaintiffs were added, and thus it would be more efficient to decide those common issues via the class action mechanism.

As MCU does not dispute its practice of charging fees based on the available balance while the actual balance contains enough money to pay for the transaction, the only issue is whether the contract permitted it to do so. Further, under Florida law, the determination of the parties' intent in entering a contract is a question of objective intent. *Harris v. Sch. Bd.*, 921 So. 2d 725, 733 (Fla. Dist. Ct. App. 2006) ("Where the language of a contract is unambiguous, there is no occasion for judicial construction. Clear contract language controls."). For this reason, among others, courts in this circuit have granted class certification for classes alleging breach of a common contract. *Herman v. Seaworld Parks & Entm't, Inc.*, 2017 U.S. Dist. LEXIS 60693, at *36 (M.D. Fla. 2017) ("[I]t is the form contract, executed under like conditions by all class members, that best facilitates class treatment.") (quoting *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1171 (11th Cir. 2010)); *see also Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1260-61 (11th Cir. 2003) (affirming class certification for breach of contract claim where the contracts were materially similar and defendant had acted the same with respect to the entire class); *Kleiner v. First Nat'l Bank of Atl.*, 97 F.R.D. 683, 692 (N.D. Ga. 1983) (collecting cases for the proposition that "claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such").

The common questions for claims for violation of Regulation E also predominate over any individualized issues. The Opt-In contract states, "An overdraft occurs when you do not

have enough money in your account to cover a transaction, but MIDFLORIDA pays it anyway."
(Complaint, Ex. 1.)  The central liability question—whether the above language describes "in a
clear and readily understandable way" MCU's overdraft service, where overdraft fees are based
on the available balance method as opposed to the ledger balance method—predominates over
any individualized questions.

### b.    This Class Action is the Superior Method of Adjudication.

Rule 23(b)(3) also requires that a certifying court find that "a class action is
superior to other available methods for fairly and efficiently adjudicating the controversy."
Fed. R. Civ. P. 23(b)(3).  "The inquiry into whether the class action is the superior method for a
particular case focuses on 'increased efficiency.'"  *Agan v. Katzman & Korr, P.A.*, 222 F.R.D.
692, 700 (S.D. Fla. 2004) (quoting *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1359 (11th Cir. 2002)).
As the Supreme Court stressed in *Amchem*, 521 U.S. at 617:

> The policy at the very core of the class action mechanism is to overcome the problem
> that small recoveries do not provide the incentive for any individual to bring a solo
> action prosecuting his or her rights. A class action solves this problem by
> aggregating the relatively paltry potential recoveries into something worth someone's
> (usually an attorney's) labor.

As Judge Posner has stated, "[t]he realistic alternative to a class action is not 17 million
individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30*." Carnegie
v. Household Int'l, Inc.*, 376 F.3d 656, 661. (7th Cir. 2004).  The desirability of concentrating the
litigation in the present forum is illustrated by the fact that the amount of an individual damage
instance is at most a $30 overdraft fee.  There is no question that a large number of class
members have suffered damages in an amount that could not justify or sustain individual
lawsuits, and the only choice is between a class action and no action.  Plaintiff is not aware of
any additional suits instituted by or against the class members concerning the subject matter of
the settlement.  Further, Class Counsel is not aware of any government actor involved in this
case or having started it.  (Kick Decl. ¶ 16.)  Superiority is met.

In sum, all factors weigh in favor of class certification.

### V.    Conclusion.

Based on the foregoing, Plaintiff respectfully requests that the Court:  (1) finally approve

the Settlement; (2) approve the requested attorneys' fees; (3) approve the requested costs; (4)

approve the claims administrator's costs; and (5) approve the class representative service award.

Dated: January 12, 2018                        Respectfully submitted,

                                   Morgan & Morgan Complex Litigation Group
                                   MCCUNE • WRIGHT • AREVALO LLP
                                   The Kick Law Firm, APC

                                   /s/ Taras Kick
                                   Taras Kick, *Pro Hac Vice*
                                   Taras@kicklawfirm.com
                                   Robert Dart, CA State Bar #264060*
                                   Robert@kicklawfirm.com
                                   **THE KICK LAW FIRM, APC**
                                   815 Moraga Drive
                                   Los Angeles, CA 90049
                                   Telephone: (310) 395-2988
                                   Facsimile: (310) 395-2088

                                   Richard D. McCune, *Pro Hac Vice*
                                   rdm@mccunewright.com
                                   Jae (Eddie) K. Kim, CA State Bar #236805*
                                   jkk@mccunewright.com
                                   **MCCUNE • WRIGHT • AREVALO LLP**
                                   3281 East Guasti Road, Suite 100
                                   Ontario, California 91761
                                   Telephone:  (909) 557-1250
                                   Facsimile:  (909) 557-1275

                                   John A. Yanchunis #324681
                                   jyanchunis@forthepeople.com
                                   Marcio W. Valladares, Bar #986917
                                   mvalladares@forthepeople.com
                                   Patrick A. Barthle II, Bar #99286
                                   pbarthle@forthepeople.com
                                   **MORGAN & MORGAN COMPLEX**
                                   **LITIGATION GROUP**
                                   201 N. Franklin Street, 7th Floor
                                   Tampa, Florida 33602
                                   Telephone: (813) 223-5505
                                   Facsimile: (813) 222-2434
                                   *Counsel for Plaintiff Tracy Fry and the Class*

**<u>Local Rule 3.01(g) Certification</u>**

The Parties conferred in good faith regarding this motion and agree to the relief

requested.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 12, 2018 I electronically filed the foregoing with the Clerk of the

Court for the United States District Court for the Middle District of Florida by using the CM/ECF system,

which sent notification of such filing to all CM/ECF participants.

*/s/ Taras Kick*
Taras Kick